## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ETTNA R. MILLER IRREVOCABLE TRUST,**

**Plaintiff,**

**v.**

**Case No. _____**

**Honorable _____**

**SANCTUARY II, INC.,**
**SANCTUARY RANCH, LLC,**
**TIMBERLAND CL, LLC,**
**DONALD PATRICK BOLLMAN,**
**RYAN BOLLMAN, and ROGER CARD,**

**Defendants.**

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, ETTNA R. MILLER IRREVOCABLE TRUST, by and through its attorneys, TEICHNER LAW PLC and LAW OFFICES OF JASON GERBER, and for its Complaint against Defendants states the following:

## INTRODUCTION

1.      This case is about a large parcel of land in Newaygo County that was leased for many years for limited purposes. It was recently returned to the owners substantially damaged and out of compliance with lease terms.

2.      In 1984, Harold Miller, predecessor to the Ettna R. Miller Irrevocable Trust ("Miller Trust" or "Plaintiff"), leased 1,120 acres in Goodwell Township (the "Property") to the predecessors of Defendants for lodging and recreation associated with whitetail deer breeding and hunting. During their occupancy, Defendants installed an unpermitted dam, destroyed the forest's

1

commercial value, buried thousands of deer carcasses, and allowed Chronic Wasting Disease ("CWD") to infiltrate its deer population and contaminate Plaintiff's land. After agreeing to remove the dam, despite knowing the State of Michigan imposed long term fence maintenance obligations on the parcel, and while pretending to negotiate with Plaintiff about resolution of these and other issues, the tenant quietly filed for corporate dissolution three weeks before the lease ended.

3.      The original 1984 lease term was 20 years (**Ex. A**); it was then extended in 1990 for an additional 20 years (**Ex. B**). In 2016, the parties agreed to a lease addendum containing some new terms (**Ex. C**). The lease expired January 1, 2024.

4.      Defendants constructed a lodge and cabins and operated a Privately-Owned Cervidae ("POC") whitetail deer hunting facility on the leased property. Upon information and belief, there have been no deer on the property since January 2, 2023.

5.      During their tenancy, Defendants installed an unpermitted dam on the parcel and agreed in 2016 to remove it before January 1, 2024, but have failed to do so per the lease agreement.

6.      Miller Trust conducted soil sampling that indicated the presence of CWD contamination in soil on the Property in 2020. CWD is a fatal and contagious neurological illness caused by highly persistent abnormal prions that affect deer and elk.  The prevalence of CWD is significantly higher in captive "farmed" deer herds than in wild deer populations. Miller Trust is unaware of any presently available successful method for removing or remediating the CWD contamination from the Property.

7.      Upon information and belief, the parcel was returned to Miller Trust littered with the shallowly buried carcasses of thousands of deer, including potentially CWD-positive carcasses,

and carcasses from Defendants' offsite operations. It is unknown if Defendants disposed of the meat from these carcasses on the Property or distributed it before burial.

8.      The State of Michigan imposed a Quarantine Order on the premises, to continue through at least January 2, 2028, requiring *inter alia* maintenance of the perimeter fence in good repair to block the ingress and egress of cervids, presumably to prevent the spread of CWD to the State's wild deer population.

9.      Miller Trust repeatedly requested Defendants lawfully remove the dam and the buried carcasses from the Property, but Defendants have not done so.

10.     Defendants have indicated they will no longer continue to maintain the fence in accordance with the State's Quarantine Order after March 1, 2024.

11.     Defendants' actions and omissions have caused extensive harms to Miller Trust, including without limitation: imposition of unreasonable costs, expenses and fees on Miller Trust, including attorney and consultant fees; exposure of Miller Trust to potential civil or criminal liability under the Quarantine Order; contamination of the natural environment and resources of the Property; reduction of the Property's value and marketability; limitation on Miller Trust's future uses of the Property; substantial interference with Miller Trust's use and enjoyment of its Property; infliction of mental anguish on Miller Trust; threatened exposure of the State's wild deer population to an unreasonably high risk of contracting CWD; and more.

12.     Miller Trust brings this Complaint against Defendants for: (1) Breach of Contract; (2) Statutory Waste; (3) Common-Law Waste; (4) Public Nuisance; (5) Nuisance In Fact; (6) Nuisance Per Se; (7) Michigan Environmental Protection Act ("MEPA"); (8) Statutory Slander of Title Pursuant to MCL 565.108; (9) Common-Law Slander of Title; (10) Alter Ego Liability; and (11) Declaratory Relief. Plaintiff seeks monetary damages exceeding $75,000, injunctive,

declaratory, and any other relief available under federal and state law resulting from Defendants' actions and omissions that have irreparably harmed its Property.

## **PARTIES**

13.     Plaintiff is the Ettna R. Miller Irrevocable Trust. Julia Tibbs is the Trustee of the Miller Trust.

14.     Miller Trust, dated February 3, 2003, as amended, is organized under the laws of the State of Indiana.

15.     Trustee Julia Tibbs is a resident of Beaverton, Oregon.

16.     Defendant Sanctuary II, Inc. ("Sanctuary II") is a Michigan corporation based in Stanwood, Mecosta County, Michigan (incorporated on August 15, 1986 and dissolved on December 12, 2023).

17.     Defendant Sanctuary Ranch, LLC ("Sanctuary I") is a Michigan limited liability company based in Stanwood, Mecosta County, Michigan (organized on October 8, 2021).

18.     Defendant Timberland CL, LLC ("Timberland") is a Michigan limited liability company based in Stanwood, Mecosta County, Michigan (organized on December 6, 2017).

19.     Defendants Donald Patrick Bollman, Ryan Bollman, and Roger Card are the President, Secretary and Director of Sanctuary II, respectively.

20.     Defendant Donald Patrick Bollman is also the organizer and member of Sanctuary Ranch.

21.     Defendant Donald Patrick Bollman is also a member of Timberland.

22.     Upon information and belief, Defendants Donald Patrick Bollman, Ryan Bollman, and Roger Card are residents of Stanwood, Michigan.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1332(a) because

the parties are completely diverse and the amount in controversy exceeds $75,000. Diversity of

citizenship exists because Plaintiff is an Indiana trust, Sanctuary II is a Michigan corporation,

Sanctuary I and Timberland are Michigan limited liability corporations, and upon information and

belief Defendants Donald Patrick Bollman, Ryan Bollman, and Roger Card are residents of

Michigan.

24.     Personal jurisdiction over Defendants exists because Sanctuary II is a Michigan

corporation, Sanctuary I and Timberland are Michigan limited liability companies, Defendants

Donald Patrick Bollman, Ryan Bollman, and Roger Card are residents of Michigan, and the

Property that is the subject of this action is located in Michigan.

25.     Because this action presents an actual controversy within this Court's jurisdiction,

this Court may declare the legal rights and obligations of the parties hereto under 28 U.S.C. §§

2201, 2202.

26.     The Western District of Michigan is a proper venue for this action under 28 U.S.C.

§ 1391(b) because it is the judicial district in which Sanctuary I, Sanctuary II, and Timberland are

based, where Defendants reside, where a substantial part of the events giving rise to this Complaint

occurred, and where the Property that is the subject of this action is located.

## FACTUAL ALLEGATIONS
### Lease Agreement

27.     Plaintiff, Miller Trust owns a 1,120-acre-parcel located at 8343 East 3 Mile Road,

White Cloud, MI 49349, in Goodwell Township, Newaygo County (again, the "Property").

28.     The Property is described as follows: entire Section 13 and east half and southwest quarter of Section 14, Goodwell Township, Newaygo County, Michigan.

29.     Harold Miller, Miller Trust's predecessor, formerly owned the Property.

30.     Effective January 12, 1984, Harold Miller leased the Property to Defendant Donald Patrick Bollman, Martin L. Wernette, and Chris S. Chase, for 20 years (the "Lease" or "Lease Agreement") (**Ex. A**).

31.     Effective August 15, 1986, Defendant Donald Patrick Bollman, Martin L. Wernette, and Chris S. Chase assigned the lease to Sanctuary II.

32.     In 1990, the Lease was extended another 20 years, to January 11, 2024 (the "Lease Extension Agreement") (**Ex. B**).

33.     After Harold Miller died in 1998, the property succeeded to Ettna R. Miller, who then transferred it to the Miller Trust.

34.     Ettna R. Miller remained a Trustee of the Miller Trust, along with Julia Tibbs (her niece), until Ettna R. Miller's death in December 2022. Julia Tibbs is now the sole remaining Trustee of the Miller Trust.

35.     The Lease was amended in 2016 (the "2016 Lease Addendum") (**Ex. C**).

36.     Among other amendments resulting from the 2016 Lease Addendum, the Lease terminated January 1, 2024, not January 11, 2024.

37.     Among other terms, the Lease Agreement provides:

a.      **Paragraph 7 ("Purpose") of the Lease Agreement** states: "It is agreed and understood that the LESSEE may use the premises, for construction and operation of a lodge, hotel, cabins or restaurant business and recreation business in general, and game breeding and harvesting, including the fencing of the property, obtaining a game breeders

licenses, and the management and harvesting of a whitetail deer herd, as well as other wildlife. The complete ownership, control and management of the white-tailed deer and other wildlife located on the premises is to be the exclusive ownership and right of the LESSEE. LESSOR agrees to cooperate with LESSEE to permit LESSEE to obtain the necessary game breeders license for purposes of management of the white-tailed deer herd. LESSEE shall obtain any permits, consents, licenses or zoning required for said uses."

     b.     **Paragraph 11 ("Possession")** explains that while "LESSEE may take possession of the premises upon execution of this agreement by the both parties, and LESSEE may peaceably and quietly occupy and enjoy the possession of the premises during the term of this lease upon complying with all of the terms and conditions stated herein" . . . "[i]n order to permit the LESSOR to inspect and harvest timber . . . LESSOR reserves the right to occupy such portion of the premises as are reasonably necessary for such purposes, however, such activities are to be limited during the deer harvest season, (October and November) so as not to interfere therewith.  LESSEE shall provide LESSOR and its timber . . . agents, keys to any locked gates . . . . "

38.    Among other terms**,** the 2016 Lease Addendum provides:

     a.     **Paragraph 4 ("Decommissioning")** dictates: "Lessee will follow DNR deer herd decommissioning rules and regulations. Lessee will provide to Lessor its proposed decommissioning plan by January 1, 2022.  Lessee will cooperate in allowing Lessor to consult with DNR regarding disposal of carcasses, the fence, and other relevant issues.  Lessee will comply with applicable laws in decommissioning the deer herd.  Lessee will use its best efforts to prevent sight or sensory problems with respect to disposal of carcasses."

b.      **Paragraph 8 ("Dam Removal")** mandates: "Lessee will remove the dam before January 1, 2024.  The dam will be removed pursuant to a plan designed by a qualified engineer and will be removed under that engineer's supervision.  Lessor will hold Lessee harmless for any damages caused to the property resulting from the dam removal.  If the dam fails prior to removal, Lessee will indemnify Lessor from any third-party claims.  Lessor reserves any common law or statutory rights to seek damages resulting from dam failure before removal."

c.      **Paragraph 9 ("Return of the Premises")** states: "Lessee shall return to Lessor the property, buildings, and fixtures on January 1, 20[2]4, with the deer herd decommissioned and the dam removed.  The property, buildings, and fixtures shall be returned without encumbrances, liens, or mortgages."

d.      **Paragraph 12 ("Attorneys Fees")** entitles the prevailing party in any litigation "related to the enforcement of this Addendum or the Memorandum of Settlement" to "reimbursement of its reasonable costs and attorneys' fees."

### Defendants' Use of the Property

39.     During its tenancy, Sanctuary II obtained a POC facility license from the Michigan Department of Natural Resources ("MDNR") for 1,059 acres of the Property and operated a private whitetail deer hunting facility on the Property until MDNR decommissioned the POC facility on November 1, 2023.

40.     During the tenancy, Defendants installed an earthen dam on the Property without a permit, creating a dam reservoir now known as Osprey Lake.

41.     During the tenancy, Defendants installed a double fence around the perimeter of the Property.

42.     During the tenancy, among other activities, Defendants constructed a lodge, cabins and other structures; granted a utility easement; installed a septic system; harvested firewood; drilled wells; operated a shooting range; and stored mobile homes.  It is unknown whether Defendants obtained any required permits for these activities.

43.     During the tenancy, among other activities, Defendants hosted hunters and others on the Property.

44.     During the tenancy, on information and belief, among other activities, Defendants bred deer on-site; imported live deer to the Property; operated commercial deer hunts; processed deer carcasses; harvested antlers; transported deer carcasses; and disposed of deer carcasses.

45.     On information and belief, Sanctuary II depopulated its deer herd by January 2, 2023.

**<u>Plaintiff's Use of the Property</u>**

46.     During the lease period, Plaintiff occasionally facilitated timber harvests as per the terms of the Lease Agreement (and as per a Right of First Refusal Agreement that was executed between the parties on June 10, 1998).  Between 2005 and 2007, Miller Trust facilitated seven timber harvests.

47.     A planned Miller Trust timber harvest in 2015 led to litigation in this Court in 2016 (Case 1:16-cv-0098), which was resolved via a settlement agreement. Such settlement included the 2016 Lease Addendum.

48.     During the lease period, Plaintiff's representatives occasionally visited the property as per the terms of the Lease Agreement.

49.     In June 2019, Plaintiff conducted a thorough inspection of the Property, which revealed mass disposal of partially disintegrating, unsightly, putrid deer carcasses in uncovered pits on the property.

50.     Plaintiff then initiated a series of correspondences with Sanctuary II about property use, carcass disposal, and the potential for CWD contamination of the Property.

51.     Counsel for Miller Trust sent a letter to Sanctuary II (to Defendant Ryan Bollman) on October 7, 2019 notifying Sanctuary II that Miller Trust does not authorize, and has never previously authorized, disposal of deer carcasses in common graves on the Property; requesting that it cease and desist doing so immediately; and seeking information about CWD in Sanctuary II's deer herd, among other requests.

## Defendants' Failure to Remove the Dam

52.     Defendants have not removed the dam on the Property, as required by the 2016 Lease Addendum.

53.     Miller Trust has not received plans designed by a qualified engineer for dam removal, as required by the 2016 Lease Addendum.

54.     Miller Trust commissioned a dam evaluation in October 2023, which *inter alia* finds the dam to be in "poor condition, with the dam needing to be either reconstructed or removed" and estimates that the cost for *removing* the dam will be between $100,000 and $180,000.

## Plaintiff's Discovery of Chronic Wasting Disease ("CWD") at the Property

55.     CWD is a "fatal and contagious neurological illness that affects deer and elk. The disease causes a spongy degeneration of the brain of an infected animal, which results in emaciation, abnormal behavior, loss of bodily functions, and death. There is no treatment or

vaccine for the ailment.  Though scientists do not believe that CWD can be transmitted to humans, hunters have been cautioned not to eat animals that appear to have CWD symptoms or have tested positive for the disease."[1]

56.     The Michigan Department of Agriculture and Rural Development ("MDARD") and MDNR published their *Michigan Surveillance and Response Plan for Chronic Wasting Disease (CWD) of Free-Ranging and Privately Owned Cervids* in 2002 and revised it in 2012 (the "MI CWD Response Plan") (**Ex. D**). The MI CWD Response Plan explains as follows:

a.     CWD is "an infectious prion disease" that is "transmitted between animals by direct contact with infectious saliva, respiratory aerosols, urine, and feces." (p. 3)

b.     "CWD is also transmitted indirectly from contaminated items in the environment such as soils where it persists for decades. Where the disease becomes established, environmental contamination likely drives CWD outbreaks perpetually, and may be the most critical factor limiting their control." (p. 3)

c.     "Effective CWD management relies on preventing establishment of the disease in the first place. Once CWD is established in an area, all methods tried to date have failed to eradicate the disease." (p. 3)

d.     "Management practices that increase biological carrying capacity (such as supplemental feeding by humans) may cause CWD to persist and spread." (p. 4)

e.     "Once established, CWD outbreaks (and the substantial costs of their management) can be expected to last for decades." (p. 4)

---

[1] *Ranch Rheaume, LLC v Dep't of Agric*, No. 317631, 2015 WL 1227566, at *1 (Mich Ct App March 17, 2015).

57.     The prevalence of CWD has been found to be significantly higher in captive farmed deer herds than in wild deer populations.[2]

58.     Upon information and belief, Sanctuary II tested deer culled from its herd for CWD beginning in 2002.

59.     Upon information and belief, CWD-positive deer were first detected in Sanctuary II's herd on the Property in late 2019.

60.     On January 14, 2020, MDARD issued a press release informing the public that three white-tailed deer tested positive for CWD in a Newaygo County deer farm.

61.     Miller Trust reviewed this press coverage and suspected this may be the Sanctuary II herd.

62.     Counsel for Miller Trust sent another letter to Sanctuary II (to Defendant Ryan Bollman) on April 24, 2020, highlighting Sanctuary II's lack of response to Miller Trust's October 7, 2019 letter, again requesting information about CWD in Sanctuary II's herd, and seeking confirmation that Sanctuary II has ceased disposal of bodies in common graves on the Property, among other requests.

63.     On June 16, 2020, Defendant Ryan Bollman sent a letter to counsel for the Miller Trust confirming the presence of CWD in its herd on the Property.

64.     Soil samples taken by the Miller Trust on the Property in August 2020 confirmed the soil is contaminated with CWD prions.

---

[2] *See* Otero, A., Velásquez, C.D., Aiken, J. *et al.* "Chronic wasting disease: a cervid prion infection looming to spillover.*" Vet Res* 52, 115 (2021), available at https://doi.org/10.1186/s13567-021-00986-y (last visited January 29, 2024) ("The prevalence of CWD in North America has been increasing exponentially during the last 6 decades.  In farmed herds the prevalence of CWD positive animals can be higher than 80% and higher than 45% in wild populations.")

65.     The Miller Trust and Sanctuary II entered into a Confidentiality Agreement on July 6, 2021, which MDARD subsequently honored, to provide otherwise-confidential information about CWD on the Property to Miller Trust (**Ex. E**).

## **Defendants' Improper Carcass Burial on the Property**

66.     Again, by April 2020, Miller Trust had repeatedly notified Sanctuary II that it did not have Miller Trust's consent to bury any carcasses on the Property.

67.     As recognized by the MI CWD Response Plan, by the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service / Veterinary Services' ("APHIS") CWD Program Standards, and by other regulatory and scientific resources, reasonable handling of CWD-positive carcasses requires incineration and burial of the ashes, alkaline hydrolysis (or similar process), or disposal in a properly lined or vaulted landfill.  It is widely recognized that only incineration and alkaline hydrolysis may destroy or deactivate CWD prions, not landfill and onsite burial methods.

68.     Upon information and belief, Sanctuary II has refused to incinerate or dispose of in a lined or vaulted landfill any CWD-positive carcasses, and instead buried deer carcasses (which may include CWD-positive carcasses) on the Property in unlined and shallow pits or graves filled beyond capacity.

69.     Sanctuary II's representative Deer Inventory records provided to MDNR in 2015-2019 show, on average, Sanctuary II culled approximately 200-400 deer annually (including fawns and those that died of natural causes) and buried those carcasses on the Property.

        a.     Upon information and belief, a fully grown, live, farmed whitetail deer weighs between 150-250 pounds; and an average deer carcass (including entrails, bones

and other remains) weighs approximately 100 pounds after processing the carcass and removing the meat.

> b.    Consequently, upon information and belief, Sanctuary II buried approximately 20,000 – 40,000 pounds of deer carcasses (including entrails, bones and other remains) on the Property annually.

> c.    It is unknown what Sanctuary II did with the deer meat before and after discovering CWD in its herd, whether meat was also buried on the Property or distributed elsewhere.

70.    It is unknown *how many* carcasses are buried on the Property, *where* they are buried, *how deeply* they are buried, and which (if any) of the carcasses are *CWD-positive*, among other unknowns.

71.    Miller Trust representatives have observed at least one large dirt mound on the Property, which likely contains deer carcasses (including entrails, bones, and other remains) and which is likely to deteriorate and erode due to weather, lack of vegetation, and other conditions.

72.    Miller Trust representatives observed other areas of disturbance that are likely burial pits on the Property.

73.    Miller Trust representatives repeatedly requested documentation of where and when carcasses have been disposed on the Property, but Sanctuary II has not provided responsive information.

74.    Miller Trust representatives repeatedly requested Sanctuary II to remove some or all deer carcasses buried on the Property, but Sanctuary II is unwilling.

**Communications in 2023-2024 between Miller Trust, Sanctuary II & the State**

75.     Between May 2023 and February 2024, Miller Trust and Sanctuary II exchanged a series of letters and emails, and held a handful of video conferences, discussing end-of-lease concerns as well as Miller Trust's potential legal claims.

76.     On May 18, 2023, Miller Trust and Sanctuary II entered into a Tolling Agreement, extending all applicable statutes of limitations periods to approximately two months after the termination of the Lease Agreement (to March 11, 2024), to allow the parties to plan for the transition and engage in meaningful discussions to resolve the Miller Trust's concerns (**Ex. F**).

77.     On September 12, 2023, the State issued Quarantine Order 20230912-JLC-1 requiring biosecurity measures on the Property through January 2, 2028, to prevent the infection of both privately-owned and wild cervidae. These measures include quarantining the property, preventing live cervidae from being moved onto the premises, and maintaining the perimeter fence in good repair to block the ingress and egress of cervids in accordance with the Operational Standards for Registered Privately Owned Cervidae Facilities, among other requirements.

a.     This Quarantine Order is directed to "Ryan Bollman," "Sanctuary II, Inc." and "Miller Trust."

78.     On December 4, 2023, Miller Trust and Sanctuary II entered into a Fence Inspection and Maintenance Agreement, in which Sanctuary II agreed to maintain the fence through the end of the tolling period (March 11, 2024) or until the parties terminate the Tolling Agreement, provided the Miller Trust continues in good faith to resolve its claims against Sanctuary II.

79.     In January 2024, Miller Trust discovered – while reviewing the State of Michigan Department of Licensing and Regulatory Affairs ("LARA") website – that Sanctuary II dissolved on December 12, 2023 (following the shareholders' decision to dissolve Sanctuary II on August

31, 2021), amid Sanctuary II's negotiations with Miller Trust. Defendant Donald Patrick Bollman signed the Certificate of Dissolution filed with LARA on December 11, 2023. Sanctuary II has never informed Miller Trust that it dissolved.

80.     Miller Trust provided fourteen (14) business days' notice to Sanctuary II of its termination of the Tolling Agreement on February 13, 2024, effective March 1, 2024.

**Applicable Statutes and Regulations**

81.     While in operation, Sanctuary II was subject to the requirements of the following applicable statutes and regulations, without limitation:

a.      *The Privately-Owned Cervidae Producers Marketing Act (the "POC-PMA")(Act 190 of P.A. 2000)* as a registered, privately-owned "cervidae livestock operation" as defined in MCL 287.952(d).

b.      *The MDNR Operational Standards for Registered Privately Owned Cervidae Facilities (the "Operational Standards")* as a registered, privately-owned "cervidae livestock operation" as defined in MCL 287.952(d).

c.      *The Bodies of Dead Animals Act ("BODA") (Act 239 of 1982), and its associated MDARD BODA Rules (Mich. Admin. Code Rules 287.651 –287.657).*

d.      *The Animal Industry Act (the "AIA")(Act 466 of 1988)*, upon issuance of any quarantine orders pursuant to MCL 287.712.

e.      *The Michigan Chronic Wasting Disease Herd Certification Program (the "MI CWD Herd Certification Program")* (as of an amendment made to the AIA in February 2020), pursuant to MCL 287.717d.

f.      *The Michigan CWD Response Plan (the "MI CWD Response Plan")(issued August 26, 2002 and revised July 18, 2012)*, which appears to be Michigan's current plan for responding to CWD in both free-ranging and privately owned cervids.

g.      *The Generally Accepted Agricultural and Management Practices ("GAAMPs") of the Michigan Right to Farm Act (the "RTFA") (Act 93 of 1981, as amended) for POCs.* This GAAMP contains a subsection on "Dead Animal Disposal."

h.      *Part 115 ("Solid Waste Management") of the Natural Resources and Environmental Protection Act ("NREPA") (Act 451 of 1994, Part 115), and its associated rules (Mich. Admin. Code Rules 299.1401 - 299.4921)*, which govern the disposal of solid waste.

i.      *Part 89 ("Littering") of NREPA (Act 451 of 1994, Part 89)*, which prohibits littering on private property.

## Defendants' Other Actions, Failures, and Omissions

82.      Upon information and belief, on April 18, 1991, Defendant Roger Card fraudulently executed a Right of Way Easement to the O&A Electric Cooperative on behalf of Sanctuary II to construct and operate on the Property and adjoining roads an electric transmission or distribution line and to cut, spray or trim trees and shrubbery that may interfere with the line (Liber 351 Page 7898). The Easement allows the electric company to install and own equipment on the Property.  The Easement states, "The undersigned covenant that they are the owners of the above-described lands and that the said lands are free and clear of encumbrances and liens of whatsoever character except those held by the following persons: [blank]." Defendant Roger Card, President of Sanctuary II at the time, signed for "Legal Signature of Property Owners."   This

signature as property owner was false, and Sanctuary II had no authority as Lessee to grant an easement on the Property.

83. Upon information and belief, Defendant Ryan Bollman held himself out individually as both "premises owner" and "animal owner" to the United States Animal Health Emergency Reporting Diagnostic System ("USAHERDS"), which is a database used for traceability and disease control activities. This identification as "premises owner" was false, and Defendant Ryan Bollman had no authority to do so.

84. Upon information and belief, between mid-September 2023 and October 2023, Defendants moved deer carcasses from Sanctuary I and Timberland onto the Property and buried them there, without the Miller Trust's consent. It is unknown *which officer or director or agent of any of these businesses* authorized such movement, *how many* carcasses from these other businesses are buried on the Property, *where* they are buried, *how deeply* they are buried, and which (if any) of these carcasses are *CWD-positive*, among other unknowns.

85. During this ongoing dispute between the parties, and despite good faith attempts by Miller Trust to reach resolution, Sanctuary II suspiciously dissolved on December 12, 2023, approximately twenty (20) days before the end of the lease:

    a. According to the state-filed dissolution, Sanctuary II shareholders voted to dissolve Sanctuary II on August 31, 2021.

    b. Sanctuary II continued negotiating with Miller Trust – seemingly in bad faith – from at least 2021 and continued to do so as recently as early 2024 without informing Miller Trust that it had already initiated dissolution.

c.      At all times, Sanctuary II's principals - Defendants Donald Patrick Bollman, Ryan Bollman and Roger Card - continued to interact with Miller Trust through their legal counsel as if there was no change to Sanctuary II's corporate entity and/or operations.

d.      These actions by Defendants Donald Patrick Bollman, Ryan Bollman and Roger Card were intentional and designed to deceive Miller Trust.

e.      Upon information and belief, during these negotiations with Miller Trust, Sanctuary II was not adequately capitalized.

f.      Upon information and belief, during these negotiations with Miller Trust, Sanctuary II was financially unable to meet its commitments to the Miller Trust.

g.      Upon information and belief, Defendants Donald Patrick Bollman, Ryan Bollman and Roger Card knew Sanctuary II was unable to meet its financial obligations but continued to portray Sanctuary II as ready to meet those obligations.

86.     Upon information and belief, Sanctuary II did not follow regular and proper corporate formalities. For instance, the principals of Sanctuary II voted to dissolve the company in August 2021 but did not file any documents with the State of Michigan concerning the dissolution until December 2023. Sanctuary II also did not provide notice of the dissolution to claimants like Miller Trust.

87.     Upon information and belief, this failure to submit appropriate corporate records to the State of Michigan and claimants was intentional and done to conceal the dissolution.

88.     Upon information and belief, Defendant Sanctuary II comingled funds and assets with Defendants Donald Patrick Bollman, Ryan Bollman, Roger Card, Sanctuary I and Timberland.

89.     Defendants Sanctuary I, Sanctuary II and Timberland all share the same resident agent – Defendant Donald Patrick Bollman.

90.     Defendants Sanctuary I, Sanctuary II and Timberland all share a principal – Defendant Donald Patrick Bollman.

91.     Defendants Sanctuary I, Sanctuary II and Timberland all share the same mailing address – 8529 100th Ave, Stanwood, MI 49346.

## **Harms to the Property and Miller Trust**

92.     None of Defendants' actions or omissions, or their resulting harms, were contemplated at the time Sanctuary II (and / or its predecessors) and the Miller Trust (and / or its predecessors) entered, extended, or amended the Lease Agreement. As a result, such harms fall outside the bounds of any contemplated damages discussed in the original Lease Agreement or its later versions.

93.     Upon information and belief, Defendants' actions and omissions have contributed to the following harms to Miller Trust, without limitation:

a.     The Property is contaminated with high concentrations of CWD;

b.     The State-issued Quarantine Order dated September 12, 2023 imposes limitations and actions potentially applicable to Miller Trust;

c.     Stigma may attach to the Property;

d.     There may be concern by the public and by Miller Trust invitees regarding CWD contaminants on the Property;

e.     Miller Trust's future land use opportunities may be constrained;

f.     The present and future timber value of the Property has been significantly reduced;

g.      The value and condition of the property is diminished by the burial sites –

filled with unpermitted, unlawful solid waste – littered throughout the Property;

h.      Miller Trust may be denied the opportunity to pursue and / or capitalize on

profits from, or earn income from, future activities on the Property including (but not

limited to) eco-tourism, recreational tourism, hospitality, and deer hunting;

i.      The value and condition of the property is diminished by the continued

presence of the dam; and

j.      Miller Trust continues to experience palpable mental anguish and fears

related to owning property contaminated with high concentrations of CWD. The threat of

these and all other injuries is a present menace for Miller Trust, which understandably

disturbs its peace of mind.

94.      Defendants' actions and omissions have contributed to the following recoverable

costs or potential costs for Miller Trust, and likely others, for:

a.      For inspecting, maintaining, and repairing the double fence at the Property,

if the State-issued Quarantine Order dated September 12, 2023 is determined to apply to

Miller Trust;

b.      Instituting and maintaining biosecurity measures at the Property;

c.      Investigating and remediating CWD contamination;

d.      Removing and remediating the unpermitted solid waste (i.e., deer carcasses)

from the soil;

e.      Removing the dam;

f.      Engaging with Defendants, MDARD, MDNR, and other State agencies,

related to obligations and limitations on property uses;

g. Investigating and litigating the instant action;

h. Increased property insurance costs;

i. Loss of profits or income from future activities on the Property which may be unviable or less profitable, including (but not limited to) eco-tourism, recreational tourism, hospitality, and deer hunting; and

j. Loss of value from any potential sale of the Property.

## Harms to the Natural Environment

95. Upon information and belief, Defendants' actions and omissions have contributed to the following harms to the natural environment, without limitation:

a. Upon information and belief, CWD prions are present in high concentrations throughout the Property, in both known and unknown locations. These CWD prions are present in any infected deer carcasses buried on the Property, and in the soil;

b. CWD prion contamination in the natural environment is highly persistent. The relevant scientific community is not presently aware of any successful methods for removing or remediating such contamination;

c. The Property may pose a risk of CWD transmission to avian scavengers and other wildlife who can translocate infectious prions to disease-free areas, which is a threat to the wild deer herd in Michigan and other states;

d. Defendants have created unpermitted, unlawful solid waste disposal sites on the Property, which also constitute substantial littering;

e. Sub-surface and surface water on the Property may be contaminated due to historically buried deer carcasses;

f.      Sanctuary II's deer herd decimated understory vegetative growth on the Property, resulting in the loss of future generations of forest growth, including timber available for future harvests;

g.      Defendants have failed to remove the dam, which is in poor condition, from the property. While the dam is in place it poses a risk of failure, flooding, and impairment to nearby natural water resources and wildlife habitats; and

h.      Any other harms discovered as this matter progresses.

## COUNT ONE:
## BREACH OF CONTRACT

96.     The Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

97.     A breach of contract occurs when a promisor fails to perform according to the contract terms.

***

98.     **First**, in breach of the express terms of the "Purpose" section of the Lease Agreement (**Ex. A**, Paragraph 7), Sanctuary II failed to obtain the "permits, consents, licenses or zoning required" for management of its white-tailed deer herd, including but not limited to those required under the POC-PMA, the Operational Standards, BODA, the associated MDARD BODA rules, the AIA, the MI CWD Herd Certification Program, the MI CWD Response Plan, the GAAMP for POC, Part 115 of NREPA, and Part 89 of NREPA, as follows:

a.      Sanctuary II failed to maintain and / or keep required farm records for all cervidae included in its herd, including but not limited to mortality records, and method and site of disposal records; and

b.      Defendants disposed of deer carcasses from Sanctuary I, Sanctuary II and Timberland (which may include CWD-positive carcasses) in common graves on the Property knowingly without the authorization of the Miller Trust, and in violation of burial depth, timing, spacing, solid waste, littering and other requirements.

99.     Sanctuary II's failure to obtain the required permits, consents, licenses, or zoning for Sanctuary II's herd management caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.  Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

***

100.     **Second**, in further breach of the express terms of the "Purpose" section of the Lease Agreement (**Ex. A**, Paragraph 7), Sanctuary II failed to properly "manage" its deer herd in the following ways (but not limited to the following):

a.      Intentionally allowing and providing the conditions to support CWD contamination and spread, including overpopulation of the farmed deer herd in excess of the carrying capacity of the Property;

b.      Failing to sufficiently prevent CWD infection in the farmed deer herd;

c.      Failing to properly dispose of deer carcasses (which may include CWD-positive carcasses); and

d.      Failing to maintain required records regarding the farmed deer herd.

101.    Such mismanagement of the farmed deer herd created conditions for Sanctuary II's farmed deer herd to become infected with CWD and led to exacerbation of CWD contamination in the natural environment on the Property.

102.    Sanctuary II's failure to properly manage its deer herd caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property. Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

***

103.    **Third**, in breach of the express terms of the "Decommissioning" section of the 2016 Lease Addendum (**Ex. C**, Paragraph 4), Sanctuary II failed to "follow deer herd decommissioning rules and regulations," and to "comply with applicable laws in decommissioning the deer herd."

104.    As part of the decommissioning of its herd in anticipation of the Lease Agreement terminating on January 1, 2024, Sanctuary II was required to comply with the requirements of the following, without limitation: POC-PMA, the Operational Standards, BODA, the associated MDARD BODA rules, the AIA, NREPA, the MI CWD Herd Certification Program, the MI CWD Plan, the GAAMPs for POCs, and any State-mandated herd management plans, which it failed to do.

105.    Sanctuary II's actions and omissions in decommissioning the private deer herd on the Property in violation of these requirements caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and

constraints on the Miller Trust's use and enjoyment of the Property.  Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

***

106.     **Fourth**, in further breach of the express terms of the "Decommissioning" section of the 2016 Lease Addendum (**Ex. C**, Paragraph 4), Sanctuary II failed to "provide to Lessor its proposed decommissioning plan by January 1, 2022."

107.     Sanctuary II's failure to provide a decommissioning plan for the private deer herd on the Property in violation of this requirement caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.  Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

***

108.     **Fifth**, in breach of the express terms of the "Decommissioning" section of the 2016 Lease Addendum (**Ex. C**, Paragraph 4), Sanctuary II failed to "use its best efforts to prevent sight or sensory problems with respect to disposal of carcasses."

109.     Specifically, Sanctuary II disposed of deer carcasses in massive, common graves that are littered throughout the Property.  These activities created sight and sensory problems on the Property, including visual disruption of the natural landscape and disturbing sights of and noxious smells from deer carcasses.

110.     Sanctuary II's actions and omissions in decommissioning the private deer herd on the Property in violation of this requirement has caused substantial harm to Miller Trust, including

26

depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.  Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

*\*\**

111.   **Sixth**, in breach of the express terms of the "Dam Removal" and "Return of the Premises" sections of the 2016 Lease Addendum (**Ex. C**, Paragraphs 8 and 9, respectively), Sanctuary II never removed the dam, nor provided any plans designed by a qualified engineer to do so.  The dam is in poor condition. While the dam is in place it poses a significant threat of failure.

112.   Sanctuary II's actions and omissions in failing to remove the dam from the Property in violation of these requirements caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property. Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

*\*\**

113.   **Seventh**, in breach of the express terms of the "Return of the Premises" section of the 2016 Lease Addendum (**Ex. C**, Paragraph 9), Sanctuary II is returning the Property to Miller Trust encumbered by costly biosecurity mandates from the State due to the CWD contamination – including, but not limited to, inspecting, maintaining, and repairing the perimeter fence at least through January 2, 2028.

114.     Sanctuary II's actions and omissions causing the imposition of such State-mandated measures caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.  Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

***

115.     **Eighth**, in breach of the express terms of the "Hold Harmless" section of the Lease Agreement (**Ex. A**, Paragraph 18), Sanctuary II's actions and omissions contributed to extensive recoverable costs and expenses for Miller Trust, both historically and prospectively.

116.     Sanctuary II's breach of the Lease Agreement in this way damaged the Miller Trust in an amount exceeding $75,000. Sanctuary II's actions and omissions therefore constitute a recoverable breach of contract.

## COUNT TWO:
## STATUTORY WASTE

117.     The Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

118.     Michigan's statutory "waste" provision, MCL 600.2919, states (in relevant part):

> *(2)(a): "Any . . .  tenant for years who commits or suffers any waste, during his term or estate, to the lands, tenements or hereditaments, without having a lawful license to do so, is liable for double the amount of actual damages . . . .*
> *(2)(b): "A claim under this provision may be brought by the person having the next immediate estate, in fee, for life, or for years or by any person who has the remainder or reversion in fee or for life after an intervening estate for life or for years; and each of the parties shall recover damages according to his estate in the premises . . . ."*

119.     During Sanctuary II's tenancy on the Property, Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent; destroying timber value; contaminating the Property's soil and waters; and installing, maintaining in poor condition, and retaining an unpermitted dam – caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.

120.     These actions and omissions constitute statutory waste.

121.     Moreover, Defendants' actions and omissions and resulting harms to the Property exceed the scope of activities permitted by the Lease Agreement.

122.     None of Defendants' actions, omissions, or their resulting harms were contemplated at the time the parties (and / or their predecessors) entered, extended, or amended the Lease Agreement.  Such harms therefore fall outside the bounds of any contemplated damages discussed within the original Lease Agreement or its later versions.

123.     Under MCL 600.2919, a tenant who commits waste without having lawful license to do so is "liable for double the amount of actual damages."

124.     As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

125.     The Miller Trust seeks all available damages and equitable injunctive relief for injuries resulting from Defendants' waste on the Property.

## COUNT THREE:
## COMMON-LAW WASTE

126.    The Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

127.    The Michigan common-law "waste" claim is a tort for the "destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." 8 *Powell on Real Property* § 56.01, p. 56-3.

128.    The three elements of common-law waste are (1) "unreasonable conduct by the owner of a possessory estate," (2) "conduct resulting in physical damage to the real estate," and (3) "a substantial diminution in the value of the estate in which others have an interest." 93 C.J.S. *Waste* § 4.

129.    An action for waste may be maintained for damage to real property that exceeds normal wear and tear.  *See Anstays v. Anderson,* 194 Mich. 1, 4-5, 7-8; 160 N.W. 475 (1916).

130.    A present possessor is expected to use the property in a reasonable manner and, as a general rule, the holder of a future interest in the property should receive it back in "substantially the same condition" it was when the present possessor took possession. *Id.* at 7.

131.    During Sanctuary II's tenancy on the Property, Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent; destroying timber value; contaminating the Property's soil and waters; and installing, maintaining in poor condition, and retaining an unpermitted dam – have caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and

significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.

132.   These actions and omissions constitute common-law waste.

133.   None of Defendants' actions, omissions, or their resulting harms were contemplated at the time the parties (and / or their predecessors) entered, extended, or amended the Lease Agreement.  Such harms therefore fall outside the bounds of any contemplated damages discussed within the original Lease Agreement or its later versions.

134.   As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

135.   Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Defendants' waste on the Property.

## COUNT FOUR:
## PUBLIC NUISANCE

136.   The Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

137.   A plaintiff whose use and enjoyment of property has been interfered with may bring an action for nuisance.  *See, e.g., Adkins v. Thomas Solvent Co.*, 440 Mich. 293; 487 N.W.2d 715 (1992).

138.   Generally, "nuisances" are dangerous, offensive, or hazardous conditions (created through either direct actions or negligence) that are injurious to the lives or health of the public or the property or personal rights of private persons subjected to the condition. *See Adkins,* 440 Mich. 293; *Brandon Twp. v. Jerome Builders, Inc.*, 80 Mich. App. 180; 263 N.W.2d 326 (1977).

139.   Specifically, "[a] public nuisance is an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 213 Mich. App. 186, 190; 540 N.W.2d 297 (1995).

140.   Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent; and contaminating the Property's soil and waters – have worsened the CWD contamination on the Property, as well as put the public health of human beings and the health of the state's wild deer herd at risk of infection.

141.   The statutes and regulations Defendants violated were enacted to preserve public health, safety, and welfare.

142.   For all these reasons, Defendants' activities constitute a public nuisance.

143.   The public nuisance continues to this day, as deer carcasses remain in the large burial pits on the Property, and the natural environment of the Property is contaminated with CWD prions.

144.   Miller Trust has been unable to prevent this public nuisance.

145.   A private citizen may file an action for a public nuisance against an actor where the individual can show he suffered a type of harm different from that of the general public.

146.   Defendants' actions directly and proximately caused and continue to cause *special damages* to the Miller Trust in at least the following ways:

> a.   As the owner of the Property, the Miller Trust has been specifically and specially injured by the continuous nuisance created and maintained by Defendants on the

Property. The special injury includes the physical damage to the Property, depreciation of the fair market value of the Property, restrictions on future uses of the Property, interference with the Miller Trust's use and enjoyment of the Property, and recoverable costs.

b.      At the end of the lease term, the Property reverted to the Miller Trust littered with buried carcasses (which may include CWD-positive carcasses) and CWD contamination destroying the natural environment of the Property.  The Property is also constrained by State-imposed mandates – including inspecting, maintaining and repairing all perimeter fencing – until at least January 2, 2028.  These requirements would not be imposed on the Property but for Defendants' mismanagement of its private deer herd, resulting CWD infection of the herd, and exacerbation of the CWD through Defendants' actions and omissions.

147.    As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

148.    Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Sanctuary II's public nuisance use on the Property.

## COUNT FIVE:
## NUISANCE IN FACT

149.    The Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

150.    A "nuisance in fact" is that "which become[s] [a] nuisance[] by reason of circumstances and surroundings . . . and . . . the natural tendency of the act is to create danger and inflict injury on person or property." *Hadfield v. Oakland Cnty. Drain Com'r*, 430 Mich. 139, 152–

53, 422 N.W.2d 205, 211–12 (1988), *overruled on other grounds by Pohutski v. City of Allen Park*, 465 Mich. 675, 641 N.W.2d 219 (2002) (citing *Rosario v. City of Lansing,* 403 Mich. 124; 268 N.W.2d 230 (1978)).

151.    Private nuisance is a "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 302-03; 487 N.W.2d 715, 719 (1992).

152.    To be liable for damage caused by a nuisance in fact, a defendant must have: "(1) created the nuisance; (2) owned or controlled the property from which the nuisance arose; or (3) employed another to do work which he knows is likely to create a nuisance." *Citizens Ins Co. V. Bloomfield Twp.*, 209 Mich. App. 484; 532 N.W.2d 183 (1994); *Radloff v. State*, 116 Mich. App. 745, 758; 323 N.W.2d 541 (1982), *remanded,* 417 Mich. 894; 330 N.W.2d 692 (1983).

153.    Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent; and contamination of the Property's soil and waters – have caused substantial harm to Miller Trust, including depreciation of the value of the Property, recoverable costs, and significant interference with and constraints on the Miller Trust's use and enjoyment of the Property.

154.    When a plaintiff prevails on a claim of nuisance, he or she is entitled to a judgment for both "damages" and to "abate[] the nuisance."  MCL 600.2940.

155.    As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

156.     Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Defendants' actions and omissions.

**COUNT SIX:**
**NUISANCE PER SE**

157.     Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

158.     A "nuisance per se" is "an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings." *Hadfield*, 430 Mich. at 152–53, *overruled on other grounds by Pohutski*, 465 Mich. 675 (citing *Rosario v. City of Lansing,* 403 Mich. 124; 268 N.W.2d 230 (1978)); *Bluemer v. Saginaw Cent. Oil & Gas Serv., Inc.*, 356 Mich. 399, 411; 97 N.W.2d 90 (1959).

159.     Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent; and contaminating the Property's soil and waters – have worsened the CWD contamination on the Property, and constitute human activity that is a nuisance per se.

160.     These actions are – at all times and under all circumstances – intrinsically unreasonable and dangerous, as they contaminate the Property, exacerbate contamination, destroy the Property's value, cause physical damage to the Property, and simultaneously create larger unreasonable biosecurity risks for the State's natural resources (including the State's wild deer herd). They have directly and proximately caused depreciation of the fair market value of the

Property, restrictions on future uses of the Property, interference with the Miller Trust's use and enjoyment of the Property, future costs, and all other damage to the Miller Trust delineated in this Complaint.

161. As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

162. Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Defendants' actions and omissions.

### COUNT SEVEN:
### MICHIGAN ENVIRONMENTAL PROTECTION ACT ("MEPA")

163. Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

164. MEPA, which is codified as MCL 324.1701, authorizes any person to seek declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

165. MEPA was enacted in 1970 by the Michigan State Legislature to implement the State's constitutional commitment to the protection of natural resources. *See* Const. 1963, Art. 4 § 52.

166. MCL 324.1701 provides a broad environmental protection standard that vests the court with extensive remedial powers, including declaratory and equitable relief; however, monetary damages are not authorized. MCL 324.1701(1).

167. Defendants' actions and omissions as delineated throughout this Complaint – including but not limited to mismanaging Sanctuary II's private deer herd; and intentionally dumping deer carcasses from Sanctuary II, Sanctuary I and Timberland (which may include CWD-

positive carcasses) in large burial pits on the Property in violation of state statutes, regulations, the terms of the Lease Agreement, and without Miller Trust consent – have already or are likely to pollute, impair, or destroy the air, water, or other natural resources on the Property in violation of MEPA, given the resulting persistence of CWD prion contamination in the natural environment and related biosecurity risks.

168.     Defendants' destruction of the layer of vegetation beneath the main canopy of the forest on the Property, also known as the "understory," by Sanctuary II's private deer herd, resulting in a lack of successive generations of timber, have also polluted, impaired, or destroyed the natural resources on the Property in violation of MEPA.

169.     Defendants' failure to remove the dam is also likely to pollute, impair or destroy the surrounding air, water, or other natural resources, given that the dam is in poor condition and poses a risk of failing and flooding the area in violation of MEPA.

*170.*     Defendants' failure to comply with the requirements of the POC-PMA, the Operational Standards, BODA, the associated MDARD BODA rules, the AIA, the MI CWD Herd Certification Program, the MI CWD Response Plan, the GAAMPs for POC, Part 115 of NREPA, and Part 89 of NREPA, among others, also constitute violations of MEPA. *See* MCL 324.1701(2).

171.     Miller Trust seeks all available damages and equitable injunctive relief resulting from Defendants' actions and omissions in violation of MEPA.

### COUNT EIGHT:
### STATUTORY SLANDER OF TITLE PURSUANT TO MCL 565.108

172.     Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

173.     MCL 565.108 governs statutory slander of title actions in Michigan and requires three elements: falsity, malice, and special damages. *See* MCL 565.108.

174.     Defendants' execution in April 1991 of the Right of Way Easement to the O&A Electric Cooperative, and signature as "Property Owners," was patently false.

175.     Defendants' only legal claim to the Property has been as a lessee. For that reason, Defendants had no good-faith basis to sign the Right of Way Easement as "Property Owners," and Defendants' actions demonstrate malice.

176.     As the actual owner of the Property, Miller Trust has been specifically and specially injured, as the Easement allows an electric company to construct, install and own equipment on the Property, as well as to cut, spray or trim trees and shrubbery that may interfere with its equipment. Additionally, as a result of the Easement, Miller Trust has incurred litigation costs, impairment of vendibility of the Property in light of this encumbrance, and other depreciation of the Property's value.

177.     As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

178.     Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Defendants' actions and omissions.

## COUNT NINE:
## COMMON-LAW SLANDER OF TITLE

179.     Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

180.     The elements of Michigan common-law slander of title are the same as the statutory claim: falsity, malice and special damages.

181.     Defendants' execution in April 1991 of the Right of Way Easement to the O&A Electric Cooperative, and signature as "Property Owners," was patently false.

182.     Defendants' only legal claim to the Property has been as a lessee. For that reason, Defendants had no good-faith basis to sign the Right of Way Easement as "Property Owners," and Defendants actions demonstrate malice.

183.     As the actual owner of the Property, Miller Trust has been specifically and specially injured, as the Easement allows an electric company to construct, install and own equipment on the Property, as well as to cut, spray or trim trees and shrubbery that may interfere with its equipment. Additionally, as a result of the Easement, Miller Trust has incurred litigation costs, impairment of vendibility of the Property in light of this encumbrance, and other depreciation of the Property's value.

184.     As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

185.     Miller Trust seeks all available damages and equitable injunctive relief for all injuries resulting from Defendants' actions and omissions.

## COUNT TEN: ALTER EGO LIABILITY

186.     Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

187.     Sanctuary II is a mere instrumentality of the individual Defendants and /or Timberland and / or Sanctuary I.

188.     Sanctuary I is a mere instrumentality of the individual Defendants and / or Timberland and / or Sanctuary II.

189.     Timberland is a mere instrumentality of the individual Defendants and / or Sanctuary II and / or Sanctuary I.

190.     Defendants Donald Patrick Bollman, Ryan Bollman, and Roger Card utilized Sanctuary II and / or Sanctuary I and / or Timberland to commit a wrong and / or fraud against Miller Trust.

191.     There exists a unity of interest between Defendants Donald Patrick Bollman, Ryan Bollman, Roger Card, Sanctuary II and / or Sanctuary I and / or Timberland such that there is no difference between the individual and corporate Defendants.

192.     Miller Trust has suffered, and continues to suffer, unjust injury and loss as a result of Defendants' actions and omissions described in this Complaint.

193.     Justice is not served by recognizing the separate corporate forms of Sanctuary II, Sanctuary I, and / or Timberland.

194.     Defendants Donald Patrick Bollman, Ryan Bollman, and Roger Card should be held personally liable for the debts and obligations of Sanctuary II, Sanctuary I, and / or Timberland.

195.     As a direct and proximate result of Defendants' actions and omissions, the Miller Trust has been injured in an amount in excess of $75,000.

196.     The Miller Trust seeks all damages and equitable injunctive relief for injuries resulting from Defendants' actions and omissions.

## COUNT ELEVEN:
## DECLARATORY RELIEF

197.     Miller Trust repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

198.    There is an actual, justiciable controversy between Miller Trust and Defendants over whether Miller Trust's property rights have been violated.

199.    Because the value of this controversy exceeds $75,000, the controversy is within the Court's jurisdictional threshold.

200.    This Court has power under 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57 to adjudicate this matter and enter its judgment declaring the rights of the parties to this action.

201.    Declaratory relief will clarify the rights and obligations of both parties to this action and is, therefore, appropriate to resolve this controversy.

202.    Miller Trust requests that this Court declare:

  a. That the Confidentiality Agreement between Miller Trust and Sanctuary II is terminated, and any information currently in Miller Trust's possession pursuant to the Confidentiality Agreement is no longer confidential;

  b. That Sanctuary II's dissolution was in bad faith;

  c. That Miller Trust is not responsible for ongoing fence maintenance and inspection required by the September 12, 2023 Quarantine Order or any subsequent Quarantine Orders or extensions;

203.    Miller Trust requests such additional declaratory relief that to which it demonstrates entitlement.

## **JURY DEMAND**

204.    Miller Trust demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PUNITIVE DAMAGES

205.    The Michigan Constitution and statutory and common law of Michigan allow for the award of punitive damages under circumstances where defendants' actions and omissions are done with such indifference to the rights of others, with wanton and reckless disregard to the rights of others, lack of care and / or ill intent, as to warrant the imposition of punitive damages.

206.    Because Defendants' actions and omissions as delineated throughout this Complaint were done with such indifference to, wanton and reckless disregard for, lack of care to, and ill intent for the Property and rights of Miller Trust, and for the greater natural environment, Miller Trust seeks punitive damages against Defendants.

## COSTS AND EXPENSES

207.    Miller Trust seeks reimbursement of all reasonable costs and expenses incurred as a result of Defendants' actions and omissions as outlined in this Complaint, and as authorized by the Lease Agreement, amendments, and addendum.

## ATTORNEY FEES

208.    Under the mandates of Michigan Supreme Court and Michigan statutory and common law and constitutional law, Defendants' actions and omissions are such and were done with such ill intent as to warrant the imposition of attorney fees incurred by Miller Trust in the prosecution of this case.

209.    Moreover, the "Attorneys Fees" section (Paragraph 12) of the 2016 Lease Addendum entitles the prevailing party in any litigation "related to the enforcement of this Addendum" to "reimbursement of its reasonable costs and attorneys' fees."  **(Ex C.**

210.    Any and all claims asserted by Miller Trust in this Complaint regarding Defendants' breach of the terms of the 2016 Lease Addendum are brought for enforcement purposes.

211.    Miller Trust seeks all such attorney fees and other damages and injunctive relief as allowed by law and equity.

## INTEREST

212.    Miller Trust seeks pre-judgment and post-judgment interest at the highest rates allowed by law.  *See* MCL 600.6013.

## INJUNCTIVE RELIEF

213.    Miller Trust seeks an order providing complete equitable injunctive relief.

***

WHEREFORE, the Miller Trust seeks judgment against Defendants under all theories alleged above, separately and / or alternatively; declaratory relief; monetary damages; costs and expenses; attorney fees; punitive damages; interest; complete equitable injunctive relief; and all such other and further relief to which the Miller Trust may justly be entitled.

Respectfully Submitted,

Dated: March 5, 2024            By:   /s Lauren A. Teichner
                                Lauren A. Teichner (P86020)
                                TEICHNER LAW PLC
                                Co-Counsel for Plaintiff Miller Trust
                                213 West Tenth Street
                                Traverse City, MI 49684
                                Phone: (231) 715-1544
                                Email: lauren@teichnerlaw.com

Jason Gerber (P83159)
LAW OFFICES OF JASON GERBER
Co-Counsel for Plaintiff Miller Trust
110 E. Danaher St.
Ludington, MI 49431
Phone: (702) 427-0162
Email: jason@gerberlawoffices.com

## EXHIBIT LIST

| | |
|---|---|
| **Exhibit A** | The Lease Agreement |
| **Exhibit B** | The Lease Extension Agreement |
| **Exhibit C** | The 2016 Lease Addendum |
| **Exhibit D** | The MI CWD Response Plan |
| **Exhibit E** | The Confidentiality Agreement |
| **Exhibit F** | The Tolling Agreement |